The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lorrie L. Dollar. Plaintiff waived oral argument before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence except for minor changes throughout and the additions of Findings of Fact 4, 5, 10 and 11.
* * * * * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement filed 16 June 1994 and at the hearing before Deputy Commissioner Dollar as:
STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and an employment relationship existed between the parties on 13 August 1992.
2. Defendant was a duly-qualified self-insured, with Associated risk Management Service as the servicing agent.
3. Plaintiff's average weekly wage was $270.00, which yields a compensation rate of $180.01.
4. The issue for determination is whether plaintiff sustained a compensable injury on 13 August 1992, and if so, to what benefits is she entitled under the North Carolina Workers' Compensation Act.
5. At the hearing, the following exhibits were received:
 a. Defendant's Exhibit (1) — Incident Report, dated 21 September 1992;
 b. Defendant's Exhibit (2) — Private Investigator's Report, dated 14 June 1994; and
 c. Defendant's Exhibit (3) — Videotape of Plaintiff.
6. The following Industrial Commission Forms are made a part of the record.
a. I.C. Form 19, filed 21 September 1992;
b. I.C. Form 18, filed 24 September 1992;
 c. I.C. Form 33, filed on or about 3 February 1993; and
d. I.C. Form 33R, filed on 23 February 1994.
* * * * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. On 13 August 1992, plaintiff was a 48 year old female who had been employed for six years with defendant-employer, which is a manufacturer of wooden frames for chairs, ottomans, and love-seats.
2. Plaintiff had a long-standing history of low blood sugar, and every two to three months she experienced "spells" in which she would become pale, her teeth would chatter, and she would need to sit or lie down during episodes when her blood sugar level would become too low. Plaintiff and her husband had instructed Jennifer Byerly, who was a vice president and co-owner of defendant, to provide plaintiff with a drink of alcohol for the spells. Ms. Byerly had occasionally had to drive plaintiff home during these spells.
3. In her position with defendant-employer, plaintiff worked as the lift-off person for the tail saw operator, Joe Dingus. Plaintiff had worked on this same job the entire time that she was employed with defendant-employer. Plaintiff's duties involved lifting one or two boards at a time from the saw table, after Mr. Dingus had sawed them to the proper size, and then placing the pieces on the appropriate buggy. The wood processed was oak board which was quarter inch board, generally in thirteen to eighteen inch lengths. Plaintiff worked within one to three feet from Mr. Dingus.
4. At approximately 11:50 a.m. on 13 August 1992, plaintiff lifted a board and experienced the sudden onset of severe pain in her groin. Also, on that date Mr. Dingus noticed that plaintiff was pale just before lunch time.
5. On 13 August 1992 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer when she experienced the sudden onset of pain while lifting a board. This occurrence constituted a specific traumatic incident of the work assigned.
6. Shortly thereafter, plaintiff told Ralph Herman, a maintenance man, to get someone, as she was having a spell. Ms. Byerly and Warren White, the other co-owner, found plaintiff pale, and they assisted her to Ms. Byerly's office. Plaintiff told them she was having a spell and to call her husband. Plaintiff reclined on Ms. Byerly's couch and sipped brandy while Ms. Byerly telephoned Mr. Simmons.
7. Mr. Simmons believed plaintiff was experiencing a spell and assisted her to bed after he transported her home.
8. On 13 August 1992, Mr. Simmons observed plaintiff to have a small lump in the crease of her right leg.
9. When plaintiff failed to recover, she plaintiff sought medical attention on 15 August 1992 and went to the Alexander Medical Clinic. Dr. Richard P. Frances admitted plaintiff to Alexander County Hospital at that time. Plaintiff was diagnosed as having an incarcerated femoral hernia, which Dr. Frances performed surgery to repair and the treatment required a resection of a portion of the small intestine due to the extreme condition of the hernia.
10. Plaintiff's hernia was caused by the specific traumatic incident she sustained on 13 August 1992.
11. The hernia which plaintiff sustained on 13 August 1992 appeared suddenly and had not existed prior to that date.
12. During her hospitalization, plaintiff experienced a small bleeder in the inguinal incision area, which was opened and packed. Plaintiff was discharged on 27 August 1992, and thereafter received a number of home health visits until the inguinal site closed.
13. Dr. Frances released plaintiff from his care, with no permanent impairment rating on 7 December 1992. He noted that plaintiff had healed nicely. At no time during the treatment by Dr. Frances did plaintiff complain of any back pain, right or left leg pain, hip pain, or hand pain. Plaintiff has not sought work nor attempted to return to work since that time.
14. On or about 17 August 1992, an employee saw plaintiff in the hospital, and reported this to Ms. Byerly. Ms. Byerly went over to the hospital to see plaintiff. Ms. Byerly prepared a Form 19 report of injury or about 27 August 1992.
15. Plaintiff notified defendant-employer by letter on or about 1 September 1992, that her femoral hernia was the result of lifting boards.
16. On or about 18 September 1992, plaintiff prepared a Form 18 which provided that her femoral hernia was caused by lifting boards off of a cutoff saw and stumbling.
17. In the Request for Hearing, plaintiff lists the injury as being a right femoral hernia and right lower abdomen.
18. Beginning in 1993, plaintiff has self-referred to Dr. Neal, a general surgeon in Statesville, to Dr. Smith, a neurologist in Hickory, and to a number of other doctors for complaints of back and leg problems. All tests have reported as normal.
19. On 23 November 1993, defendant referred plaintiff to Dr. William Gessinger for an evaluation. Plaintiff presented with complaints of inability to eat, frequent partially formed stools, shoulder pain, numbness in the left hip and leg, pain radiating into the left leg, and left leg weakness. Plaintiff's abdominal examination and upper and lower gastrointestinal x-rays were all normal. Plaintiff exhibited variable and inconsistent responses to stimuli in the same areas, and also kept changing the history of her conditions and problems. Dr. Gessinger found plaintiff to not be believable. Dr. Gessinger found no evidence to relate any of plaintiff's symptoms to the femoral hernia in August of 1992. Plaintiff also complained of numbness in her hands, which was not causally related to the hernia.
20. Beginning in the fall of 1993, plaintiff began serving as the live-in companion, sitter, and reading for Minnie Mitchell, who is an elderly woman.
21. On 21 March 1994, Mr. Dingus, who left the employ of defendant-employer in June of 1993, observed plaintiff at Ms. Mitchell's home, trimming hedges with hedge clippers. Plaintiff did not appear to have any difficulty moving about and maneuvering the clippers. Plaintiff did not walk with a limp, and did not use a cane.
22. On 22 March 1994, Mr. Dingus saw plaintiff and her husband at Wal Mart. Plaintiff used a cane to get out of the car, and she walked with an extreme limp, which appeared unusual to Mr. Dingus.
23. No doctor has prescribed a cane for plaintiff.
24. On 13 June 1994, plaintiff was observed by a private investigator at Ms. Mitchell's home in Hiddenite. Plaintiff carried a pail of liquid across the yard, walking without a cane or a limp. Plaintiff walked back to the house and returned to the clothesline with a red bucket. Plaintiff bent over five times to retrieve and hang two pairs of shoes on the clothesline, and she lifted the bucket and returned to the home. Forty minutes later, plaintiff carried several clothing items, which she hung on the clothesline. Plaintiff returned to the yard with a bag and emptied the contents of the bag onto the yard. Later, plaintiff assisted Ms. Mitchell from a van to the house and returned to the van to retrieve a shopping bag and a small folding table, which she carried to the home.
25. On 14 June 1994, plaintiff was again observed at Ms. Mitchell's home by the investigator. Plaintiff drove from Ms. Mitchell's home in Hiddenite to Stony Point, to an Exxon Market. When plaintiff got out of the car, she used a cane and walked with a pronounced limp.
26. Plaintiff drove to the post office, where she exited the car without the cane, and she did not walk with a limp. She drove across the railroad tracks to Stiffy's trading Post and Feed Store, where she carried the cane and walked with a noticeable limp. Plaintiff carried a small bag to her car and a clerk placed a 50 pound bag of some variety of yard product in the back of the car. Plaintiff carried a very large tomato plant to the car. As she backed out of the lot, plaintiff abruptly stopped the car and got out without the cane. She walked quickly to the hatchback, opened it, and rearranged a number of items. Plaintiff did not exhibit any limp.
27. Plaintiff was next observed to drive to a supermarket where she used the cane to exit the car, returning later with a bag of groceries.
28. Plaintiff returned to Ms. Mitchell's at approximately 11:46 a.m., where she quickly made three trips to and from the car within three or four minutes. Plaintiff did not use the cane, and did not exhibit any limp as she unloaded the large plant, the groceries, and the other items from the store. Plaintiff ceased unloading the car after a neighbor confronted the investigator and went in to make a telephone call.
29. Later on 14 June 1994, plaintiff self-referred to Brent Fischer, D.C., at which time she complained of difficulty walking. After x-rays and testing, Mr. Fischer formed the opinion that plaintiff had lumbar and lumbosacral strain with subluxations of L2-L4, cervical and mid-thoracic strain with subluxations at C1, C4-C7, T1-T2, T4-5, T-8, and spondylosis and degenerative disc at C5-6. Plaintiff told Mr. Fischer that she first noticed this when hospitalized for the hernia. Based upon the history plaintiff related Chiropractor Fischer opined that he believed it related to the trauma which caused the hernia.
30. The greater weight of the competent medical evidence suggests that plaintiff's back, neck, hip, leg, arm, and shoulder complaints are not causally related to the femoral hernia. In fact, plaintiff made no linkage of these complaints to the hernia until she was seen by Chiropractor Fischer.
* * * * * * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. In order for a hernia to be compensable, plaintiff bears the burden of proving that: (a) there was an injury resulting in hernia or rupture; (b) the hernia or rupture appeared suddenly; (c) the hernia or rupture immediately followed an accident. Provided, however, a hernia shall be compensable under this Article if it arises out of and in the course of the employment and is the direct result of a specific traumatic incident of the work assigned. (d) the hernia or rupture did not exist prior to the accident for which compensation is claimed. N.C. Gen. Stat. § 97-2 (18).
In this case, plaintiff's femoral hernia, which did not exist previously, appeared suddenly on 13 August 1992, while she was performing her duties as a lift-off person. The plaintiff did not sustain an accident at that time, but the hernia was the direct result of a specific traumatic incident of her duties. Therefore, the femoral hernia is compensable.
2. As a result of the compensable hernia, the plaintiff is entitled to temporary total disability compensation from 14 August 1992, through 7 December 1992, at the rate of $180.01 per week. N.C. Gen. Stat. § 97-29. Plaintiff is not entitled to any compensation after her release by Dr. Frances due to her failure to return to work or to seek other employment.
3. Plaintiff is not entitled to any permanent partial disability compensation for bodily disfigurement, pursuant to N.C. Gen. Stat. § 97-31 (22). In order to be compensable, the bodily disfigurement must be of a nature as to be reasonably presumed to lessen opportunities for remunerative employment and so to reduce future earning power. In this case, plaintiff's scarring is on the abdomen and groin area, which would not be visible during normal employment. Therefore, the scars would not impair future occupational opportunities and are not compensable. Wilhite v.Liberty Veneer Co., 47 N.C. App. 434, 267 S.E.2d 566, rev'd. onother grounds, 303 N.C. 281, 278 S.E.2d 243 (1981).
4. Plaintiff has failed to carry the burden of proving that any medical care after 7 December 1992 is causally related to the femoral hernia. Therefore, she is entitled only to have defendants pay medical expenses incurred from 15 August 1992 through 7 December 1992 which are causally related to the hernia, including bills from Dr. Frances and from Alexander County Hospital. N.C. Gen. Stat § 97-25.
* * * * * * * * * * * * * * *
Based on the foregoing finding of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Subject to the attorney's fee hereinafter awarded, defendant shall pay temporary total disability compensation to plaintiff for the period from 14 August 1992 through 7 December 1992 at the rate of $180.01 per week. This compensation has accrued and shall be payable in a lump sum.
2. A reasonable attorney's fee of twenty-five percent of the compensation awarded in paragraph (1) above is hereby approved to be deducted from the sum due plaintiff and paid directly to counsel.
3. Defendant shall pay medical expenses incurred as a result of the femoral hernia through 7 December 1992, which are causally related to care required by the work-related injury.
4. Defendant shall pay the costs.
 S/ ______________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________________________ COY M. VANCE COMMISSIONER
S/ ______________________________ DIANNE C. SELLERS COMMISSIONER